**CONWAY IMPORT COMPANY, Inc.,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**No. 65–C–1241.**

United States District Court,
E. D. New York.

Dec. 18, 1969.

See also D.C., 40 F.R.D. 5.

Kamerman & Kamerman, New York City, by Jerome Kamerman, New York City, of counsel, for plaintiff.

Vincent T. McCarthy, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., by Johnnie M. Walters, Asst. Atty. Gen., David A. Wilson, Donald A. Statland, Attys., Dept of Justice, Washington, D. C., of counsel, for defendant.

## OPINION AND FINDINGS

JUDD, District Judge.

This suit for refund of corporate income taxes, tried without a jury, involves the right of a food purveyor to deduct gratuities paid by its salesmen to the employees of its customers.

A similar issue for the same company was resolved by the Internal Revenue Service in 1947 after conference in the office of the Internal Revenue Agent in Charge, and deduction of all but a small portion of the payments was permitted for 1947 and for the next ten years. In 1957, after a similar deduction for such payments had been allowed on the original audit, the ruling was reversed on recommendation of a Regional Analyst, and a deficiency was assessed.

The amounts involved are so large that the result may be crucial to the taxpayer's solvency. The payments amount to approximately ten percent of gross sales. The deductions disallowed for 1957 on review amounted to $187,819, resulting in a tax deficiency of $98,262.-45, which has been paid. Since the review took place several years after the return was filed, taxpayer's transactions for two other years (1958 and 1959) may be affected by the decision of this case. Taxpayer's total net worth at December 31, 1957 was $193,133.

Five points must be considered in reaching a decision. In order to succeed in the case, the taxpayer must carry the burden of proving three things:

(1) That it paid out the sums claimed as deductions;

(2) That they were ordinary and necessary business expenses; and

(3) That records of the expenses were kept in conformity with published I.R.S. rules and regulations.

The taxpayer urges an alternative argument with respect to record-keeping:

(4) That it was entitled to notice from I.R.S. before being required to change its method of record-keeping.

The government urges a separate point which would undercut all the taxpayer's arguments, namely:

(5) That public policy requires disallowance of the payments as commercial bribes.

Two statutory provisions are involved with respect to deductibility of the expenses.

Section 162(a) of the Internal Revenue Code of 1954 provides that:

"There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. * * *"

With respect to record-keeping, Section 6001 of the Internal Revenue Code of 1954 provides that:

"Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary or his delegate may from time to time prescribe. Whenever in the judgment of the Secretary or his delegate it is necessary, he may require any person, by notice served upon such person or by regulations, to make such returns, render such statements, or keep such records, as the Secretary or his delegate deems sufficient to show whether or not such person is liable for tax under this title."

In both instances, the 1954 Code provisions involved no significant departure from the language of the Internal Revenue Code of 1939.

### 1. *Payments of Gratuities by the Taxpayer*

During 1957 the taxpayer expended $205,829 in gifts and gratuities on gross sales of $2,280,951. The payments were made on the basis of vouchers drawn up each week by Julius Domash, the taxpayer's general manager. These vouchers showed the total sales made since the last payment of gratuities to the customers on whom the taxpayer's fifteen salesmen were expected to call during the following week. Opposite the sales figure, each voucher contained a figure of approximately ten percent of the sales, representing the amount to be distributed among employees of the customers such as chefs, stewards, maitre d's, receiving clerks, and storeroom men. Each week a check for the total amount of gifts and gratuities was drawn to cash, entered on the check stub and on the books as "commissions and brokerage" and distributed in person to the local salesmen and by ordinary mail to the out-of-town salesmen.

Julius Domash testified that the payments were in fact made to the salesmen. The government was furnished with the names of the salesmen, and the dates and amounts of each payment to each salesman, as part of the plaintiff's answers to interrogatories in this case.

■■ The government makes two attacks on this testimony. First, it describes the testimony as self-serving—an objection which became invalid when parties were first given the right to testify in court. 2 Wigmore, Evidence (3d ed. 1940) §§ 576–577. Second, it argues that there is an inconsistency between Julius Domash's testimony and an affidavit which Samuel Domash, the taxpayer's sales manager and treasurer, signed early in 1958, saying that the payments ranged from five percent to fifteen percent, rather than a flat ten percent, and that they were sent to the customers' employees directly rather than to the salesmen. One weakness in this argument is that the affidavit was prepared by an Internal Revenue Service agent in Philadelphia, after conversation with the manager of taxpayer's Philadelphia warehouse (who was not shown to have direct knowledge of the facts), mailed by the agent to Samuel Domash for signature, and signed by him in the exact form in which I.R.S. had prepared it. Another explanation of the claimed discrepancy is that the I.R.S. agent's notes referred to payments of five percent to an individual employee, with a maximum of ten percent to any firm. Two subse-

quent affidavits in the same pattern do not persuade the court to disbelieve Julius Domash's testimony.

Testimony of one of the salesmen was offered at the trial. Sidney Kay, a director, stockholder and secretary of the taxpayer, received $22,850 during 1957, and testified that he distributed the entire amount as gifts and gratuities to employees of his customers. Since the names of all salesmen were available to the government as well as the taxpayer, the fact that the taxpayer did not call other salesmen creates no inference that can be helpful to the government.

The Revenue agent who audited the tax return for 1957 spoke to some of Conway's salesmen and formed an opinion that "probably the bulk of them had received the money" and that "a good part of that was undoubtedly paid out."

Taxpayer's salesmen reported the distribution of the cash given to them each week by returning to Julius Domash the memorandum which they received with the cash, marked to show that the gratuities had been paid. These memoranda were kept until the preparation of the next memorandum for the same group of customers, and then were destroyed. The original vouchers listing the payments for each customer were retained, however, and 58 vouchers for 1957 were received in evidence.

On the basis of the entire record, the court finds that the taxpayer in fact paid $205,829 to its salesmen for commissions and brokerage, to be distributed as gifts and gratuities to employees of customers, and that the money was paid out by the salesmen.

### 2. *The Expenses Were Ordinary and Necessary*

The president of the taxpayer, Albert P. Heinemann, testified that payments of gratuities to customers' employees had been the general practice of food wholesalers for whom he had worked before the incorporation of Conway Import Company, Inc., and that he had learned of the practice from his father, who conducted the business of Heinemann Brothers.

From the founding of the taxpayer corporation in 1921, its practice was to distribute amounts equivalent to about ten percent of its gross sales as cash gifts or gratuities to employees of its customers. Its customers were mainly hotels, restaurants, private clubs, and institutions. Its products were mainly salad dressing, cooking oils, pickles, and condiments. The original justification for the payments was that the stewards, chefs and sous-chefs of plaintiff's customers came largely from France, Italy and Switzerland, where the practice of making gifts to such employees was general and where salaries were so low that the owners must have expected the employees to supplement their income in this way.

Once having instituted such a practice, the taxpayer would understandably feel obliged to continue it. There was testimony that failure to make such payments would risk a sharp decline in sales. The testimony of plaintiff's witnesses made it clear that it was both useful to the taxpayer corporation and necessary for its business to expend these sums in question.

After a widespread survey of "kickbacks" to chefs and stewards by wholesale food purveyors catering to the hotel, private club and institutional trade, an Internal Revenue agent reported to his Group Supervisor that:

> "The survey referred to (in which the Intelligence Division cooperated) demonstrated that payment of tribute of this kind is universally practiced by nearly all firms engaged in the wholesale food industry. Even old-established and highly respected firms feel that they must engage in this practice in order to deny to less scrupulous rival firms the unfair competitive advantage it would otherwise confer upon them."

A Special Agent from the Philadelphia office of the Internal Revenue Service

stated that he had investigated ten or twelve major suppliers and that the majority of them had the practice of making such payments.

In its answers to interrogatories, the taxpayer listed the names of its eight largest competitors. Although the income tax returns of these competitors were presumably available to the government, it did not call any of them as witnesses. Instead, it produced three witnesses from other companies to testify to the absence of payments. One of these had no salesmen and made the calls himself; the second had nothing to do with sales and was not familiar with practices in 1957; and the third worked for a company that had only minor institutional sales. Their testimony had little relevance to the issue before the court.

■ The government relies on United Draperies, Inc. v. Commissioner of Internal Revenue, 340 F.2d 936 (7th Cir. 1964), cert. denied, 382 U.S. 813, 86 S.Ct. 30, 15 L.Ed.2d 61 (1965), where the majority opinion stated as a matter of common knowledge that "kick-backs" are not an ordinary means of securing or promoting business. What may be common knowledge in Illinois cannot counteract solid evidence of what took place in New York and Philadelphia. Moreover, in the *United Draperies* case, the payments were made to only three customers and none were made to nine other important customers.

■ The government's suggestion that the payments must in any event be treated as capital expenditures, because of the statement that they were made to maintain "good-will," is without any reasonable basis.

■ The court finds that the payments were ordinary and necessary expenses of the taxpayer's business.

### 3. *The Taxpayer's Record-Keeping and I.R.S. Regulations*

■ As noted above, the duty of the taxpayer is to keep such records as the Commissioner may require either "by notice served upon such person or by regulations." I.R.C. § 6001. No notice requiring different record-keeping methods was served before the deficiency assessment nor is it claimed that any such notice was served upon the taxpayer.

There was no regulation concerning the nature of records that a taxpayer must keep to substantiate expenditures until Section 1.6001-1 of the Federal Tax Regulations was promulgated on Februray 17, 1959. Its pertinent paragraphs provided:

"(a) In general. Except as provided in paragraph (b) of this section, any person subject to tax under subtitle A of the Internal Revenue Code of 1954, or any person required to file a return of information with respect to income, shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information.

\*　\*　\*　\*　\*　\*

"(d) Notice by district director requiring returns, statements, or the keeping of records. The district director may require any person, by notice served upon him, to make such returns, render such statements, or keep such specific records as will enable the district director to determine whether or not such person is liable for tax under subtitle A of the Code."

The taxpayer's records in fact complied with this standard, by showing "the amount of \* \* \* deductions." Its practice with respect to record-keeping was the same from 1947 through 1957. Revenue agents were shown each year the vouchers for the payments, and did not ask for the names of the ultimate recipients to whom the salesmen distributed the cash.

Subsequently, however, when income tax investigations were being conducted in the Philadelphia area and the taxpayer was asked for the amounts paid to particular employees of customers in

that area, the requested information, covering years 1950 to 1956, was provided from confidential personal records maintained by Samuel Domash and S. G. Kay.

The government has not been able to show any published ruling or instruction prior to 1961 which even arguably requires the taxpayer to keep a record of persons to whom salesmen pay gratuities.

*References Cited by the Government*

In an Exception Memorandum dated November 30, 1961, an analyst reviewing the 1957 audit report, requested the examiner to reconsider the 1957, 1958, and 1959 returns of the taxpayer, stating:

"It is held that the examiner in 1957 committed substantial error in that he did not consider all the facts in the case and did not follow procedures outlined in the IR Manual, Sections 4244(1), 4267.41 and 4269.1(4) in making the audit. The examiner did not develop the facts, or prepare a complete self supporting report. The examiner apparently allowed the major percentage of unsubstantiated expense as a deduction for the purpose of settlement."

The references are not to published regulations, but to the internal manual for I.R.S. agents.

These provisions in the manual are addressed primarily to travel and entertainment, but will be deemed to be applicable also to other business expenditures.

(1) Section 4244(1) of the Manual, as it stood from 1954 to 1960, seems to have been violated by the analyst rather than by the auditor. The analyst cited no published rulings which forbid the practice adopted by the taxpayer in this case, although the Manual says:

"(1) Examining officers should support the conclusions reached in their investigations, by National Office rulings, opinions of the Chief Counsel for the Internal Revenue Service, decisions of the Tax Court of the United States and court decisions, whenever possible. The rulings, opinions, and decisions relied upon should be clearly stated and identified in the report."

(2) The next reference of the analyst is to a provision which first came into the Manual on May 10, 1961, and which states in its pertinent parts:

"4267.41 GUIDELINES IN DETERMINING THE ADEQUACY OF RECORDS ·

"(1) While it is not possible to specify the exact records required of every taxpayer, each taxpayer is required to have available the following information:

(a) The relationship of the expenditure to the taxpayer's business.

(b) The payee and place of the expenditure.

(c) The amount of the expenditure.

(d) The nature of the product or service received.

(e) The identity of the person or persons entertained, or the recipient of any gift (by name or title or otherwise).

(f) Evidence of payment where the amount of the expenditure is large, or the nature of the expenditure is unusual.

\* \* \* \* \* \*

"(5) Some taxpayers base their deductions for business expenditures on checks made out periodically to themselves or to 'cash'. Such checks are not to be considered to be supporting evidence of the expenses claimed unless the taxpayer maintains adequate records on the nature of his expenditures. If a taxpayer claims business expense deductions on the basis of the cancelled checks alone, he will be considered to have inadequate records."

If Section 4267.41 were given retroactive application, it appears that the taxpayer's records show all the facts required by Subdivision (1). The only question would relate to records of "the

recipient of any gift (by name or title or otherwise)." There was testimony about the general titles of the recipients. Even the names of the ultimate recipients were "available," as shown by the data which was supplied to the Internal Revenue agent in Philadelphia when he requested it. Since there was no express requirement in 1957 to show the ultimate recipient of each gift, it is not necessary to explore the meanings of "available" or "by name or title or otherwise."

The taxpayer's records also conform to Subdivision (5) of 4276.41, even if its terms were applied retroactively, for the commission and brokerage expenditures were not based on "cancelled checks alone." Each check to cash was supported by "records on the nature of his expenditures," as shown by the vouchers which were presented in court.

(3) The final section of the Manual mentioned by the analyst was 4269.1(4), which is entitled "Deductions and credits based upon several small expenditures." This section was not violated. It is significant that this provision of the Manual states that "commonly recognized business practice" does not require that expenses be established "beyond any reasonable doubt." On the contrary, this Manual section, which was adopted in 1954 and still in effect in 1960, affirmatively recognized that "proof may be established by credible oral testimony."

It is true that the same section in the Manual provides that:

"it is not the policy of the Service to allow a percentage or other arbitrarily computed portion of deductions of this character merely for the purpose of settlement."

This again was not a published document; it was added to the Manual in 1954, several years after the conferee's report of 1947, and was never called to the attention of the taxpayer. Moreover, the percentage disallowed by the 1947 conferee was not a percentage of all the commissions and brokerage, but only a percentage of the amount paid to Mr. Kay, the stockholder-salesman.

The court finds that the taxpayer has sustained the burden of proving that its records were kept in accordance with published I.R.S. rules and regulations.

### 4. The Taxpayer's Right to Notice of any Change in Record-Keeping Requirements

The taxpayer's method of keeping records was approved (except for a minor adjustment) by a conference report dated June 19, 1950, relating to its 1947 tax return. On that return, $160,787.68 had been deducted for "commissions and brokerage." The conferee allowed $146,-718.76 of payments, the only disallowance being one-quarter of the payments which were made to Mr. Kay; in his case, since he was a stockholder, the conferee apparently felt that stricter proof was necessary covering his disbursement of the amounts of gifts and gratuities paid to him for distribution.

The conferee who made the determination had the authority to resolve an issue on the basis of the information as presented, making certain that the pertinent provisions of the Internal Revenue Code were applied in arriving at such solution and that the solution was in accord with the interpretation of the controlling authorities by the Internal Revenue Service as expressed in regulations and rulings, but without giving consideration to the hazards of litigation or the ability of plaintiff to pay any amount which might be agreed upon in disposing of the disputed tax liability. The conference report on the taxpayer's 1947 return was approved by the Chief Conferee and sent to the taxpayer by his superior, the Internal Revenue Agent in Charge of the Brooklyn Division. The letter from the Agent in Charge, transmitting the recomputation of liability "reflecting the conclusions reached as a result of the conference," bears a stamp showing that it was also reviewed by Division A in 1951.

The commissions and brokerage expenditures were allowed in succeeding

years on the basis of the conference report on the 1947 return. The audit of the 1948 return stated, in disallowing one-quarter of the commissions and brokerage part to Mr. Kay, "Amounts not substantiated are disallowed." The report on the 1949 return was similar.

The reports on the 1950 and 1951 returns each stated, "Based on 1947 conference report, disallowed portion deemed unsubstantiated." Similar comments were made with respect to the 1952, 1953, 1954, 1955, and 1956 returns.

The initial audit report on the 1957 return stated, "To disallow amount deemed unreasonable and excessive in proportion determined in 1947 informal conference report (25% of 35% of $205,829.40)."

The formula used from 1950 through 1957 was actually stricter than the one applied in 1947. Mr. Kay's sales in 1957 represented only a little more than ten percent of the gross sales, instead of 35% as had been the case in 1947. The total payments made to him for gifts and gratuities in 1957 amounted to only about $22,850, and the 1947 formula, applied according to its reasoning, would have provided for disallowing only $5,700 of such expenses instead of $18,000.

The Chief of the Regional Analyst Unit in the New York area testified that around 1960 there was a national policy that taxpayers would be warned if their records were inadequate, and that a form letter was used to notify them of the necessity of changing their record-keeping, before they would be severely dealt with. There was no evidence that the analyst who reviewed the taxpayer's 1957 return brought the matter to the attention of his Chief, or that the Chief of the Regional Analyst Unit gave any instructions to depart from the national policy of sending a warning letter.

Warning letters were discontinued about May, 1963, after the enactment in late 1962 of Section 274 of the Internal Revenue Code. Pub.L. 87-834, 76 Stat. 960. The 1962 legislation set forth in Subsection (d) the nature of substantiation required for gifts, but the section was applicable only to taxable years ending after December 31, 1962. See Historical Note in 26 U.S.C.A. § 274.

■ This case must be considered in the perspective of the years involved. In 1957 the rule of Cohan v. Commissioner of Internal Revenue, 39 F.2d 540 (C.C.A.2d 1930), still applied; business expenses could be allowed on the basis of a reasonable approximation even though the taxpayer kept no account. 39 F.2d at 543-544. It was not until October 16, 1962 that this was changed by Congress (I.R.C. § 274), and not until December 29, 1962 that a regulation was published setting forth new standards. T.D. 6630, 27 F.R. 12930, now constituting Reg. 1.-274-5. The provision inserted in the non-public Internal Revenue Manual in 1961 as Section 4267.41 foreshadowed the statute and the regulation; but it cannot be applied retroactively, in the face of Congress' decision to give only prospective application to the statute.

The policy of giving notice was publicly expressed by Dana Latham, Commissioner of Internal Revenue, in an address to the Illinois State Chamber of Commerce on October 21, 1960, where he stated:

" * * * whenever we find that the taxpayer does not maintain adequate records of business expenses, the District Director will send him a letter calling attention to this fact, and informing the taxpayer how to *correct* the deficiencies in his record keeping. *The taxpayer* will also be told that if he *fails to maintain adequate records* in future years, the allowability of his deductions will be determined under a more strict standard than the Service applied *in the current examination.*" (Italics from the Exhibit.)

In reference to the future examination of taxpayers, Commissioner Latham further stated:

"The same criteria will be used during the first examination as we have used in the past in determining the allowability of deductions for business ex-

pense. However, after the taxpayer has been specifically put on notice of what should be done to comply with the law, it seems to me we have every right to apply a more strict standard in cases where business expenses are still not properly substantiated."

Nothing to the contrary was stated in Judge Mishler's opinion in this case, on which the government relies. He was ruling on a motion for discovery of reports concerning four other taxpayers as well as the defendant, and held that the taxpayer had failed to show good cause for their inspection. A subsequent decision by Judge Rosling in this case overruled objections by the government to similar interrogatories by the plaintiff, stating that:

"The courts have left doors ajar though narrowly, for review of action taken by the director in alleged abuse of his discretion through volte face administrative procedures retroactively applied."

*The Commissioner's Duty of Consistency*

■ Consideration of the cases cited by both parties, and of other authorities, shows that this is a case where the Commissioner owes a duty of consistency in his interpretation of the regulations until he has notified the taxpayer that a new rule will be applied in future years.

■ This point has been argued by the parties on the basis of estoppel, which does not precisely state the applicable doctrine. Courts have held that the doctrine of estoppel should not be applied to prevent retroactive correction of a mistake of law, (Estate of Guenzel v. Commissioner of Internal Revenue, 258 F.2d 248 [8th Cir. 1958]; Automobile Club of Michigan v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 [1957]; Wolinsky v. United States, 271 F.2d 865 [2d Cir. 1959]), but that it may be applied with caution in other circumstances. Schuster v. Commissioner of Internal Revenue, 312 F.2d 311 (9th Cir. 1962) (where trust funds had been distributed in reliance on a notice from I.R.S.); Vestal v. Commissioner of Internal Revenue, 80 U.S.App.D.C. 264, 152 F.2d 132 (1945) (forbidding two different bases of tax on the same transaction); H.S.D. Co. v. Kavanagh, 191 F.2d 831, 844–846 (6th Cir. 1951) (holding Commissioner bound by his predecessor's approval of a pension trust); Willamete Valley Lumber Co. v. United States, 252 F.Supp. 199, 205–206 (D.Ore.1966) (twelve years' consistent audits constitute construction of statute).

The taxpayer claims that the government should be estopped from alleging the insufficiency of its records, on the basis of the government's long and consistent acceptance of these records.

In urging that it is not estopped, the government relies heavily on Automobile Club of Michigan v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957). There the Commissioner had ruled that plaintiff was a non-taxable club, and several years later determined that the Club was taxable and that the former ruling was incorrect as a matter of law. He sought to apply the new ruling retroactively within the statute of limitation period. The court affirmed the Commissioner's action, saying that the government was not estopped from correcting a mistake of law, and that such a correction could be applied retroactively.

■ The taxpayer here argues that even if an error of law was made in this case, there are exceptions to the rule stated in *Automobile Club of Michigan, supra*. These exceptions are based on the compelling equities of particular cases.

This position is well founded. Apart from the doctrine of estoppel, there is a duty of consistency and fair dealing on the part of the Commissioner. Orange Securities Corp. v. Commissioner of Internal Revenue, 131 F.2d 662 (5th Cir. 1942). The court there stated:

"When such a fact or transaction is projected in its tax consequences into another year there is a duty of consistency on both the taxpayer and the

Commissioner with regard to it, whether or not there be present all the technical elements of an estoppel."

Canada Dry Bottling Co. of Florida v. Fahs, 109 F.Supp. 187 (S.D.Fla. 1952) reached a similar result, in a dispute as to the method of accounting to be used with respect to returnable bottles. The taxpayer first treated the bottles as inventory, on the theory that title to the bottles never left taxpayer. In 1946, the Internal Revenue Service challenged this procedure, assessed a deficiency, and forced the taxpayer to treat the bottles as sold to its customers. The taxpayer paid the deficiency and changed its accounting procedures to conform with the ruling. In 1950, I.R.S. again challenged the accounting method used and assessed a deficiency. The court disallowed the 1950 deficiency on the ground that there was a duty of consistency on the government. 109 F.Supp. at 192.

In *Canada Dry*, the taxpayer conformed to a ruling requiring it to change its accounting methods. Here the taxpayer simply continued the record-keeping procedures that the Service had reviewed. However, the difference is not great. The taxpayer here could just as properly rely on the conference report and the annual audits as could Canada Dry on the ruling.

This requirement of consistency has often been expressed by courts in terms of fundamental fairness, a concept deeply ingrained in our legal system. In Willamette Valley Lumber Co. v. United States, 252 F.Supp. 199, 205, *supra*, the court said:

"(W)hile the doctrine of estoppel is seldom employed against the Government in tax cases \* \* \* the Government should not lure a taxpayer by its prior position \* \* \* to conduct its business according to certain rules that have been established and then suddenly change these views with regard to one taxpayer."

The court went on to say:

"The admitted fact that the Government audited these returns for a period of approximately ten years, without complaint, would demonstrate, if nothing else, that there must have been doubt or ambiguity in the taxing statute, in which case the statute must be strictly construed against the Government." *Id.*

The question is not whether the Commissioner may notify a taxpayer that a previously acceptable standard of record-keeping will no longer be acceptable. At times it may be his duty to do so. However, any such action should be accomplished with a minimum amount of unfairness to the taxpayer.

The requirement for notice is particularly valid here, where the statute requires the taxpayer only to keep such books and records as are required by regulations or by notice from the Commissioner. I.R.C. § 6001.

The facts in this case compel the conclusion that it would be grossly unfair to allow the Commissioner to apply his ruling retroactively. A record-keeping system that has been substantially accepted for a long period of time, after careful review by many agents at different levels of authority, should not be changed except on timely notice, which should be prospective in its application.

5. *Public Policy Does Not Require Disallowance of the Deduction*

The federal government seeks to enforce an alleged state law violation as a reason for denying deduction for the expenditures here involved.

The court considers the gratuities to have been paid for the purpose of assuring a continued flow of business from the taxpayer's customers, and not for the disingenuous reasons advanced by the taxpayer. The payments were all made to persons who the taxpayer thought would have some influence on continuing purchases of its products. In fact, there was testimony that the taxpayer thought that discontinuance of the payments would put it out of business. The secretive manner in which the payments were made, and the effort to

**16**

shield the names of some of the highly reputable concerns whose employees accepted payments, show the purpose clearly.

It does not follow that the payments were necessarily violations of the statutes against commercial bribery or that illegal payments are not deductible. The Pennsylvania statute (Penal Code § 667) is in a state of innocuous desuetude (compare Poe v. Ullman, 367 U.S. 497, 500, 501–502, 81 S.Ct. 1752, 6 L.Ed.2d 989 [1961]), with no record of any conviction for violation of the law. The New York statute (former Penal Law, McKinney's Consol.Laws, c. 40, § 439) has been strictly construed. Shemin v. A. Black & Co., Inc., 19 A.D.2d 596, 240 N.Y.S.2d 622 (1st Dept. 1963).

■ Both statutes extend their prohibitions only to payments made without the knowledge of the employers. There is some indication that gratuities such as here involved were a matter of common knowledge in the industry. The court in a tax case should not pass on matters which would be defenses in a criminal prosecution.

■ The rule to be applied is rather what the United States Supreme Court stated in Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 691, 86 S. Ct. 1118, 1121, 16 L.Ed.2d 185 (1966):

> "We start with the proposition that the federal income tax is a tax on net income, not a sanction against wrongdoing. That principle has been firmly imbedded in the tax statute from the beginning. * * * "

The *Tellier* case permitted deduction for the expenses of an unsuccessful defense against a criminal indictment. Even more pertinent is Lilly v. Commissioner of Internal Revenue, 343 U.S. 90, 72 S.Ct. 497, 96 L.Ed. 769 (1952), where the court allowed a deduction for kick-backs paid by a manufacturer of eyeglasses to optometrists and observed that the expenses were ordinary and necessary, in the sense that they reflected a nationwide practice and were regarded as essential to the business.

This court is not persuaded by the Bankruptcy Referee's decision in Matter of Michaud, 69–2 U.S.Tax Cas. ¶ 9677 (W.D.Pa. 1969), which the government cites. The proof of the ordinary and necessary character of the expenses was much clearer here, and should have satisfied even the unfriendly standards which were applied in *Michaud*.

■ The government suggests that the failure to record the names of the ultimate recipients on the taxpayer's books impeded its collection of individual income taxes. The information furnished to the government concerning employees who received gratuities in 1950 to 1956 shows that no individual received as much as $600, and even if the payments had to be recorded as made to the employees of customers rather than to the salesmen who distributed the gratuities, information returns on Form 1099 would not have been required. The Internal Revenue agent who reported on the investigation of kick-backs by wholesale food purveyors stated as one of his recommendations that:

> "In particular, more stringent civil penalties than those provided under existing law, should be adopted for failure to file information returns (Form 1099)."

In this case the government seeks to impose severe penalties before any change is made in the law.

There would be no justification for this court to impose a penalty of $98,000 per year for the failure to file the few 1099 forms that might have been due for 1957 under the Commissioner's new interpretation. Disallowance of a deduction is neither an appropriate nor an authorized penalty for failure to file information returns.

■ The court rejects the government's claim that public policy requires disallowance of the claimed deductions.

*Amount of Recovery*

It is not necessary to determine whether the taxpayer could have success-

fully resisted the disallowance of $18,010 of its commissions and brokerage payments in 1957. This adjustment was accepted by the taxpayer after the original audit and the resulting deficiency was paid. This claim for refund is related solely to the additional tax imposed when the return was reviewed pursuant to the Regional Analyst's Exception Memorandum.

This opinion is intended to include the findings of fact necessary under Rule 52 of the Federal Rules of Civil Procedure.

The court therefore concludes that plaintiff should recover the amount of the tax in issue, $98,262.45, plus interest.

Submit judgment on notice.