New Amsterdam Fish, Inc. v. Commissioner.
New Amsterdam Fish, Inc. v. Commissioner
Docket Nos. 2853-65, 5406-65.
United States Tax Court
T.C. Memo 1971-17; 1971 Tax Ct. Memo LEXIS 315; 30 T.C.M. (CCH) 80; T.C.M. (RIA) 71017; January 21, 1971, Filed Jules Ritholz and Robert S. Fink, 52 Wall St. New York, N. Y. for the petitioner. Marvin A. Fein and Patrick E. Whelan, for the respondent. 81 FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies of $26,118.62, $31,219.64, $32,300.15, and $35,024.46, for the taxable years ending in 1960, 1961, 1962, and 1963, respectively. Both parties have made concessions so that the sole issue left for our decision is whether, during the relevant years, petitioner made deductible cash payments through its salesmen to certain of its customers' employees. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein *316 by this reference. Petitioner is a New York corporation whose principal place of business at the time of the filing of the petitions herein was in New York, New York. Petitioner filed its income tax returns for the years 1960 through 1963 with the district director of internal revenue in Manhattan. Petitioner is a purveyor of fresh fish and sells to restaurants, hotels, clubs and institutions in the New York City area. Petitioner's principal officers and stockholders during the years in issue were Louis Berger and Daniel Cipriano (hereinafter referred to as Berger and Cipriano). Cipriano and Berger had been associated with petitioner since 1928 and 1937, respectively, and as a result of their long experience both had extensive knowledge of the customs and operations of the fresh fish purveying business. After World War II, with the advent of a competitive frozen fish industry which netted a substantial share of petitioner's market, petitioner's sales began to decline. The basic reason for the popularity of frozen fish was that the preparation and care of fresh fish was much more extensive and complicated, and necessitated much closer supervision than the preparation and care *317 of frozen fish. Fresh fish must be scaled, gutted, cleaned, deheaded, deveined, and portioned before it is ready to be cooked. On the other hand, frozen fish is delivered in properly portioned packages and needs little preparation before it may be used in the cuisine. Also, frozen fish may be left unrefrigerated for long periods of time while fresh fish has to be placed on ice within a short time after its delivery to the consumer. Finally, frozen fish is appreciably less expensive than fresh fish. A related cause of petitioner's declining sales stemmed from the objections of the kitchen help employed by petitioner's clients. These kitchen helpers (hereinafter referred to as fish handlers) disliked the unpleasantness and difficulty of preparing fresh fish and preferred other chores. While the rate of turnover among the fish handlers was very high, they were also much in demand and could upset the business of their kitchens if they were not adequately compensated for the task of preparing fresh fish. Their complaints about fresh fish might be enough to persuade their employers to switch to frozen fish. Furthermore, with respect to petitioner's business they could adversely influence *318 their employers' purchasing agents, chefs and stewards by telling them that petitioner's fresh fish was of low quality. It became customary among the members of the fresh fish purveying industry to provide compensation to the fish handlers in order to placate and ingratiate them. Berger, Cipriano and other members of the fresh fish purveying trade often discussed this custom at meetings of the Associated Fish Purveyors, Inc., an industry trade association for which Cipriano served on the board of directors. Thus, in the late 1940's petitioner, through its officers, salesmen, and Ralph R. Mabel, a certified public accountant (hereinafter referred to as Mabel), attempted to devise a system whereby the fish handlers would be compensated for the unpleasantness associated with handling fresh fish. After consideration of various alternative systems, Mabel and petitioner's officers and salesmen decided that the salesmen, on their periodic visits to petitioner's clients, should transmit cash to the fish handlers. Mabel devised a comprehensive voucher system to provide a record of the cash distributed to the fish handlers. While the accounting system was initiated primarily to provide adequate *319 tax records, it also accomplished the usual accounting objectives. Both of petitioner's salesmen during the years in issue were honest and trustworthy employees who had been associated with petitioner for many years; both had developed a close social as well as business relationship with Berger and Cipriano. The fish handlers received payments based on a fixed percentage of their employer's total monthly purchases from petitioner. The percentage rates, which were fixed by petitioner's salesmen, varied from 2 percent to about 10 percent, and averaged about 82 5 percent. Petitioner did business with some restaurants, however, whose fish handlers received no compensation whatever from petitioner. The monthly payments, which varied from less than $2 to well over $100 per client, were divided up among each client's fish handlers. Whenever petitioner made a sale, its bookkeeping staff issued an invoice and recorded the sale in its sales journal and in its accounts receivable ledger. At the end of each month or at the beginning of the following month, petitioner's bookkeepers tabulated the month's sales on lists (hereinafter referred to as expense control sheets) in order to compute *320 the compensation payable to the fish handlers employed by each customer. The expense control sheets listed each customer's name, the total of each customer's purchases, the percentage used in calculating the payments to each customer's fish handlers, and the dollar amounts payable to each customer's fish handlers. Where no percentage was indicated on the expense control sheets, the percentage was understood to be five percent. For each customer whose fish handlers were to receive payments from petitioner, petitioner's bookkeeping staff filled out a small pre-numbered brown envelope (hereinafter called an expense control envelope) which was intended to serve as a voucher for payments to the fish handlers. The expense control envelopes showed the customer's name, the period covered, the amount of sales to the customer during that period, and the amount of payments to be made to the customer's fish handlers during that period. Both Berger and petitioner's head bookeeper checked the expense control sheets and the expense control envelopes for accuracy. Occasionally, petitioner's bookkeeping staff would in a single month prepare more than one expense control envelope per customer. This *321 procedure was necessary because petitioner's salesmen sometimes made separate trips to the same customer with each salesman taking a separate envelope or because the salesman sometimes needed to make extra payments in order to mollify dissatisfied or newly employed fish handlers. These extra expense control envelopes were issued at the express request of petitioner's salesman. The expense control envelopes for each month were not prepared at the same time and, as petitioner's bookkeepers prepared the expense control sheets only once near the end of each month, the expense control sheets did not anticipate some of the extra expense control envelopes. The expense control sheets, therefore, were only guide sheets and served primarily as computational aids for the preparation of the main group of expense control envelopes which were filled out near the end of each month. Having calculated the payments due the fish handlers, petitioner's bookkeeping staff drew checks for part of the total payments. During any one month petitioner often issued several small checks instead of one large check to cover the fish handlers' payments. Petitioner found it necessary to spread this expense out *322 because it usually did not have enough money in its bank account to issue one large check, and in any event its salesmen could not visit all of their customers at one time. Each check, which was usually drawn to cash (and occasionally to one of petitioner's employees), was cashed by whomever of petitioner's employees happened to be passing by petitioner's bank at the time the check was to be cashed. The checks were posted to the cash disbursements journal and; at the end of each month, the total attributable to those checks was debited to an account called the sales expense fund and credited to cash. After the checks were cashed the money was brought back to petitioner's office where petitioner's salesmen took the expense control envelopes and inserted the indicated amount of cash in each envelope. As the salesmen visited their customers, they removed the cash from each expense control envelope and distributed the cash, either personally or through the chefs and stewards, to the fish handlers in the customers' kitchens. Upon completing their rounds and making the payments, the salesmen returned the opened expense control envelopes to petitioner's bookkeeping staff who kept the *323 envelopes with petitioner's other books and records. Each expense control envelope was then posted to a separate journal called the expense control journal. At the end of each month the total of the expense control journal entries corresponding to the expense control envelopes was debited to a general ledger account entitled sales commissions and credited to the sales expense fund account. Finally, the sales commission account was closed out at the end of each taxable year to the profit and loss account. 83 On its corporate income tax returns petitioner reported the annual totals of the payments to the fish handlers under the heading "Schedule of Cost of Goods Sold: Sales Commissions." These totals have been stipulated as follows: Taxable
Year Ending
Sales Commissions
1960
$47,271.98
1961
50,291.71
1962
53,725.67
1963
54,027.95
Opinion From the late 1940's through the years in issue here, petitioner's salesmen transmitted cash payments to fish handlers employed by the restaurants, hotels, clubs, and institutions which comprised petitioner's customers. The payments, which were customary in the fresh fish purveying trade, were intended to compensate *324 the fish handlers for the unpleasantness associated with cleaning and preparing fresh fish. At trial and on brief respondent went to great lengths to dispute that petitioner had ever made the payments. In stating our findings of fact we have concluded this controversy, and we have necessarily determined that petitioner has met its burden of proving that the payments were made. Although petitioner's salesmen during the years in issue had died sometime before trial, the record contains stroong evidence that the salesmen actually made the questioned payments, either directly or through the fish handlers' immediate superiors. This evidence includes, inter alia, the customs in the fresh fish purveying trade, the close personal relationship and trust existing between the salesmen and petitioner's officers (who both testified at the trial), and the general corroborative testimony of petitioner's other witnesses. Having decided this factual question, we remark that respondent does not seriously contest the legal issue of whether the payments would be deductible as ordinary and necessary business expenses under section 162(a) of the Internal Revenue Code of 1954. Indeed, *325 if we look to the tenets applied in Lilly v. Commissioner, 343 U.S. 90 (1952); Paramount Finance Company v. United States, 304 F. 2d 460 (Ct. Cl. 1962); Fiambolis v. United States, 152 F. Supp. 10 (E.D.S.C. 1957); Frank J. Valetti, 28 T.C. 692 (1957), reversed on another issue, 260 F. 2d 185 (C.A. 3, 1958); and, particularly, Conway Import Company v. United States, 311 F. Supp. 5 (E.D.N.Y. 1969), we would be compelled to find that the payments here in issue were deductible as ordinary and necessary business expenses. Petitioner has offered other grounds to support its position. However, in view of our finding that petitioner made the deductible cash payments, we need not deal with its alternative contentions. In order to reflect concessions made by both parties, Decisions will be entered under Rule 50.