Arnold D. GOODRIDGE, Plaintiff,

v.

The HARVEY GROUP, INC., and Components Plus, Inc., Defendants–Counterclaimants,

v.

Frank FERNANDEZ and Alfonse Daula, Additional Defendants on the Counterclaims.

Arnold D. GOODRIDGE and New Wave Electronics, Inc., Plaintiffs,

v.

The HARVEY GROUP, INC. and Components Plus, Inc., Defendants–Counterclaimants,

v.

Frank FERNANDEZ and Alfonse Daula, Additional Defendants on the Counterclaims.

Nos. 82 Civ. 8691(MEL), 82 Civ. 8692(MEL).

United States District Court, S.D. New York.

Aug. 23, 1991.

Bickford Hahn & Haley, New York City, for plaintiffs (Richard E. Hahn, of counsel).

Kelley, Drye & Warren, New York City, for defendants (Michael L. Hirschfeld, of counsel).

Ferber, Greilsheimer, Chan & Essner, New York City, for defendants on counterclaim (Robert Chan, of counsel).

LASKER, Senior District Judge.

Arnold Goodridge and his company, New Wave Electronics, Inc. (collectively "Goodridge"), bring this action to recover on contracts between Goodridge and his former company, Components Plus, Incorporated ("Old CPI"), which were assumed by Neboc, Inc., a subsidiary of The Harvey Group, Inc., after Neboc acquired Old CPI.[1] Harvey has presented numerous affirmative defenses and counterclaims which essentially allege securities or common law fraud by Goodridge, his former Old CPI co-owner Frank Fernandez, and another former official of Old CPI, Alfonse Daula.[2] This decision follows a bench trial.

For reasons discussed below, Goodridge's contract claim is granted, while Harvey's counterclaims and affirmative defenses are dismissed.

I.

The bench trial and this decision culminate a lengthy litigation history in which many factual issues have been ruled upon and many others have been stipulated by the parties. Familiarity with earlier proceedings is assumed, and this opinion adopts the undisputed facts set forth in the decision of summary judgment motions reported at 728 F.Supp. 275 (S.D.N.Y.1990) as well as the stipulated facts submitted in the Joint Pretrial Order dated March 20, 1991.

From September 1979 through January 21, 1981, Goodridge and Fernandez each owned half the Class A Common Stock in Old CPI, a New Jersey corporation which distributed electronic components to industrial customers primarily in the defense industry.

In roughly June 1980, Harvey officials began to consider acquiring Old CPI, which appeared to them to complement Harvey's existing activities. On July 7, 1980, Goodridge, Fernandez and Harvey's Chief Executive Officer Harvey Sampson met and discussed the nature and performance of Old CPI. Fernandez and Goodridge informed Sampson that Old CPI had just completed the most successful fiscal year in its history.

Following the July 7 meeting, Sampson made known to Fernandez and Goodridge that because he had had unsatisfactory dealings with Goodridge he would be unwilling to purchase Old CPI if Goodridge were affiliated with the company. Nevertheless, Harvey officials continued to evaluate prospective acquisitions including Old

---

1. Immediately upon completion of the merger, Neboc assumed the name Components Plus, Inc. ("New CPI"). This opinion refers to defendants collectively as Harvey to prevent confusion with Old CPI. However, this court granted summary judgment dismissing the claims against the Harvey Group on June 23, 1983 on the grounds that there was no basis for piercing the corporate veil to reach Harvey itself. Ac-

cordingly, Goodridge's only current claims are against New CPI, although both New CPI and Harvey have pending counterclaims against Goodridge, Fernandez and Daula.

2. Daula was named President of CPI on October 22, 1980.

CPI, and on July 21 met with Fernandez but not Goodridge.

Fernandez and Goodridge meanwhile began negotiating a buyout of Goodridge's shares in Old CPI. Goodridge's departure was effected on January 21, 1981, when Goodridge and Old CPI closed on a series of agreements including a promissory note, employment agreement, consulting agreement and guarantee and when Goodridge resigned as a director and officer of Old CPI.[3] These agreements, taken as a whole, provided for immediate payment of $1,444,000 and additional payments over the next ten years to Goodridge. The Consulting and Employment Agreements specifically provided that should Old CPI be acquired by any other entity, that entity would assume in a writing acceptable to Goodridge all of Old CPI's obligations to Goodridge. After January 21, 1981 Goodridge was no longer a stockholder, officer, director or full-time employee of CPI.

The March 31, 1981 Audited Consolidated Financial Statement prepared for Old CPI indicated that Old CPI was obligated to Goodridge for $20,000 per year on the Employment Agreement, plus a total of $550,-000 payable to New Wave on the consulting agreement. The statement fixed the present value of those two agreements at $395,000, and noted that under the agreements neither Goodridge nor New Wave was obligated to perform any services under the contracts. The statement also listed "long term debt" of $124,335 owed to Goodridge under the Note.

Merger discussions between Old CPI and Harvey intensified during early 1981. Goodridge took no part in the negotiations.

Harvey's President, Harvey Sampson, told Fernandez that he was concerned by reports or rumors he had heard that Old CPI engaged in unethical business methods, possibly including bribes; Fernandez assured him that was not the case.

On June 26, 1981, Fernandez and Daula entered into a "Merger Agreement" with Neboc, Inc., Harvey's subsidiary, pursuant to which Neboc was to acquire all shares of Old CPI and was to change its name to Components Plus, Inc. ("New CPI"). The merger closed on August 5, 1981, with Neboc tendering to Fernandez and Daula 311,-972 shares of Harvey stock, valued by management at $1,747,000, and also paying Old CPI's legal fees of $56,323, in exchange for Fernandez's and Daula's stock in Old CPI. At that time, Fernandez and Daula received five-year employment contracts with Neboc. On August 5, 1981 New CPI entered an "Assumption Agreement" by which it assumed all Old CPI's obligations to Goodridge. Goodridge's approval was necessary before completion of the merger, and his attorney did review and authorize the merger agreement before the closing. However, Goodridge did not personally review the various closing documents, nor warrant their accuracy. New CPI continued making all payments required by the contracts.

The Merger Agreement of June 26, 1981, pursuant to which the August closing was completed, contained a number of specific representations by Fernandez and Daula. Among these were:

1. That Old CPI's financial statements of June 30, 1980 and March 31, 1981 "present fairly the consolidated financial position of CPI ..., and the consolidated results of their operations for the nine

**3.** Goodridge and CPI signed four separate agreements. A "Stock Purchase Agreement" provided for an initial cash payment to Goodridge of $1,444,000 for his interest in the company. An "employment agreement" required CPI to pay Goodridge a salary of $20,000 per year for ten years and to provide him with health insurance and two leased automobiles in exchange for unspecified business services. Old CPI also agreed to maintain an employee stock option plan for Goodridge for the duration of his employment. A separate "Consulting Agreement" provided for payments to Goodridge's company,

New Age Electronics, totalling $65,000 per year through 1986 and $40,000 per year from 1987 to the end of 1990. In exchange for "value received" Old CPI gave Goodridge a promissory note (the "Note") in the sum of $141,108, made payable in monthly installments of $6,520. Finally, Fernandez executed a personal guarantee (the "Guarantee") of "prompt and unconditional payment" of the obligations to Goodridge arising from any of these agreements.

Summary judgment has been granted in Goodridge's favor as to Fernandez's liability to him under the Guarantee.

months then ended, in conformity with generally accepted accounting principles...." Merger Agreement ¶ 3.5.

2. That as of June 30, 1980 and March 31, 1981 "neither CPI nor any Subsidiary was liable for or subject to any material direct or indirect liability ... known or unknown, fixed or unfixed, ... of a kind as would be reflected on, or reserved for or against ... in a consolidated balance sheet of CPI and the Subsidiaries presenting fairly [their] financial position" except as disclosed in the balance sheets for those dates. Merger Agreement ¶ 3.6.

3. That "since March 31, 1981 there has been no change in the business, assets, ... or condition (financial or otherwise) of CPI ... which has had or will have a materially adverse effect on its business.... Merger Agreement ¶ 3.8.

4. That Old CPI had "made timely payment of all taxes ... due and payable.... Provision in conformity with generally accepted accounting principles has been made in the Final Balance Sheet for the payment of taxes accrued and unpaid at March 31, 1981, whether or not yet due and payable and whether or not disputed. [CPI shall not] have any material liability for Taxes ... for or in respect of any period or periods up to and including the Closing Date," except as reflected in the March 31, 1981 balance sheet. Merger Agreement ¶ 3.9.

5. That "Schedule XIII hereto," which made no mention of potential litigation arising from a bribe scheme, "is a true and complete schedule of all disputes, claims, actions, suits or proceedings, arbitrations or investigations, either administrative or judicial, pending or, to the knowledge of CPI or any of the Stockholders, threatened or contemplated, by or against or affecting CPI...." Merger Agreement ¶ 3.17.

6. That "Neither CPI nor any of the Subsidiaries is in material violation of any ... law, ordinance or regulation applicable to ... the operation ... of its business." Merger Agreement ¶ 3.24.

In late 1982, Harvey sold its military and electronics business, which included all the business of Old CPI, to Pioneer–Standard Electronics, Inc. Harvey received a total of $26 million for those elements of its business. At the time of the sale no allocation of value to the various business operations sold was made, and Harvey has not presented any evidence or argument to shed light on what value it received for its sale of Old CPI's assets.

In early 1982, a federal grand jury in St. Louis which was investigating corruption in the defense industry served CPI with subpoenas *duces tecum* to provide information concerning its practices from 1975 to 1980. In its review of CPI's records pursuant to those subpoenas New CPI's counsel learned of apparent improprieties in Old CPI's operations. By August 1982 New CPI suspected that Old CPI had falsified records to conceal payments to individual officers and employees and that these funds had been used in part to bribe purchasing agents at major customers of Old CPI. New CPI also suspected Goodridge's complicity in such bribes. In August 1982 it terminated payment of its various contractual obligations to him.

It has been stipulated, and Goodridge testified, that while Goodridge and Fernandez were co-owners of Old CPI, they had a "mutual understanding" that each of them could withdraw funds from Old CPI for any purpose. These withdrawals were not closely monitored. While the exact amount of the withdrawals is uncertain, it is clear that both Goodridge and Fernandez through a variety of means extracted substantial amounts of money from Old CPI, much of it for personal use, and much of it through a shell corporation established by Goodridge and known as Marlin Industries, Inc. ("Marlin").

Old CPI's payments to Marlin were recorded on Old CPI's books as legitimate business expenses, and were deducted from Old CPI's taxes and included in its financial reports. Marlin did not in fact perform any work for Old CPI. Goodridge and Fernandez both drew money from Marlin, with Goodridge using the funds in part to

pay for a boat and part of a condominium in Puerto Rico. Goodridge also caused Old CPI to write checks totalling $78,000 to his father-in-law, Joseph Reznikoff, although Reznikoff performed no services for Old CPI. Both Goodridge and Fernandez knew of or participated in a scheme to generate additional funds "off the books" by causing sham "commission" checks to be issued to various Old CPI employees, who then would cash the checks and return the money to Goodridge, Fernandez or other CPI employees. While the exact amount of such sham commissions is disputed, it is stipulated that an employee named Mitchell Stein received over $218,292.96 in sham commissions, and that the amount of legitimate commissions paid to Old CPI salespersons was "substantially less" than the amount reported as deductible on Old CPI's 1980 corporate tax return. Goodridge acknowledged arranging for these sham commission checks to be issued in odd amounts so as to appear legitimate to anyone reviewing Old CPI's books. It is stipulated that CPI's legitimate deductions were overstated from 1976 through 1981.

The evidence as to the existence of a bribe scheme by Old CPI officials comes from three sources: the testimony of Old CPI's former Controller, Bernard Salter; the deposition testimony of Terrence Gibbs, formerly a buyer at Emerson Electric Company; and the deposition testimony of Herbert Myers, a principal of Current Components, Inc., another distributor of military electronics components.

Salter, whose duties including keeping Old CPI's books, made entries for the sham commission checks, and prepared tax returns containing deductions for those sham commissions. However, he had no direct knowledge concerning the issuing or cashing of checks in connection with the alleged kickback scheme, nor of any actual bribes. Salter testified that during the fiscal year ending June 30, 1980, he was told by his superiors that the false commissions were used to generate funds for kickbacks and bribes needed to secure contracts for Old CPI. He could not remember specific conversations in which he was told of Old CPI's bribe practices, but he believed that both Fernandez and Goodridge (as well as another former CPI official, Paul Weinstein) were the source of his understanding that Old CPI practiced bribery as a means of obtaining business. He recalled being told that purchasing agents at three of Old CPI's customers, two of which were primarily customers of Goodridge and one of which was primarily a customer of Fernandez, required such payments. When pressed on cross examination, Salter maintained that while he could not recall a specific conversation in which Goodridge discussed bribery practices with him, he was sure that such a conversation took place.

Gibbs testified that he and Fernandez met in 1975 and established a bid-rigging scheme in which apparent competitors would submit inflated bids, with the winning bidder returning a portion of the contract's proceeds to Gibbs in cash. At the time Fernandez was employed at a contractor known as Lafayette, while Goodridge and Weinstein operated Old CPI. According to Gibbs, both Old CPI and Lafayette participated in the kickback scheme, which was masterminded by Fernandez. Gibbs testified that the kickback arrangement continued after Fernandez joined Old CPI.

Myers, who operated Old CPI's competitor Current Components, stated that Frank Fernandez told him of a kickback scheme governing sales to Emerson Electronics, and that on one occasion he saw Fernandez give Gibbs an envelope which Myers understood to contain cash in connection with the kickback scheme. Neither Myers nor Serge Mandell, the other principal of Current Components, could connect Goodridge with the kickback scheme.

Goodridge testified that between 1975 and 1980, he never encountered the payment of bribes from Old CPI to its customers, and that he never made such payments himself.

Additional evidence of the existence of a bribe scheme and of Fernandez's involvement in it is the fact that Fernandez failed to testify to rebut the evidence concerning his involvement in such a scheme, and that he invoked the fifth amendment when

questioned on the topic in depositions. *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976) (trier of fact may draw adverse inference against civil litigant who asserts fifth amendment privilege).

Based on the evidence as to the existence of a bribe scheme at CPI and as to Goodridge's involvement in it, I find that Old CPI did engage in a kickback scheme at least as to Emerson, and possibly as to other customers as well. Fernandez clearly knew of, planned, and participated in this scheme, as is demonstrated by the testimony of Salter, Gibbs and Myers. Based largely on Salter's testimony that Goodridge would have been aware of such a scheme and discussed it with him, and his testimony that he understood bribes to have been paid to two of Goodridge's customers, and on Goodridge's intimate involvement with the conduct of Old CPI's affairs, I find that Goodridge was aware of the existence of such payments. However, there is insufficient evidence to establish that Goodridge himself ever made, planned or facilitated any bribes. Salter's testimony that he understood that two firms with which Goodridge dealt received bribes was not specific to Goodridge's personal behavior, was based on too uncertain a recollection and derived from an insufficiently clear source to warrant a finding that Goodridge himself participated in bribes at those companies. All available evidence points to Fernandez as the chief architect and implementer of Old CPI's scheme of kickbacks.

There has been no direct evidence presented as to the amount of bribes paid by Old CPI, and it is uncertain what percentage of money generated from sham commission checks and other illicit methods went to bribes and what amount went to Goodridge's and Fernandez's personal use.

None of the hidden income they received was reported in Goodridge's or Fernandez's income tax returns for the relevant years. The tax fraud and bookkeeping irregularities at Old CPI were not disclosed to Harvey before the merger, nor was the existence of any bribe scheme.

On April 11, 1986 Goodridge pled guilty to one count of conspiracy to commit tax evasion and one count of conspiracy to commit tax fraud on his income from 1979. Fernandez on June 20 pled guilty to conspiracy to defraud the United States through the payment of unlawful bribes and kickbacks and to one count of tax evasion.

## II.

Goodridge's present suit seeks to recover from Harvey and New CPI under the Agreements they assumed through the Assumption Agreement with Old CPI. Harvey has filed affirmative defenses and counterclaims against Goodridge, Fernandez and Daula, alleging essentially that those officers of Old CPI committed common law fraud, securities fraud and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (1988 & Supp.1989), by failing to disclose the material fact that Old CPI's profits were generated primarily as a result of a scheme to bribe purchasing agents of major defense contractors. Harvey alleges two theories of damages, one that it was harmed because sales and profits dropped sharply when it curtailed Old CPI's corrupt practices, the other that it was harmed because Old CPI's book value, upon which the sales price was based, was overstated because it did not reflect tax liability caused by Old CPI's unlawful deduction of false "commissions" that in fact were used as bribes or as unreported dividends to Goodridge and Fernandez.

Harvey does not contend that Goodridge has not established a prima facie case of its obligation to him on the contracts Goodridge entered with Old CPI upon his departure from that company. The Assumption Agreement expressly provides for Harvey's assumption of all Old CPI's obligations to Goodridge under the Employment and Consulting Agreements and the Note. Harvey contends, however, that its affirmative defenses excuse performance.

As an alternate theory, Goodridge alleges that he is entitled to collect directly from Harvey as an intended third party benefi-

ciary of Harvey's agreement to indemnify Fernandez for any liability to Goodridge arising from Fernandez's personal guarantee that CPI would fulfill its obligations to Goodridge under the Consulting and Employment Agreements and the Note.

Fernandez has been held liable by summary judgment on that Guarantee. 728 F.Supp. 275 (S.D.N.Y.1990). However, Goodridge has not received payment from Fernandez pursuant to that judgment. The parties disagree as to whether Harvey's obligation to anyone under the Indemnity Agreement is triggered by the mere entry of judgment against Fernandez or only by actual payment on the part of Fernandez. Harvey also contends that in any case payment must be made to Fernandez rather than directly to Goodridge, a contention Goodridge denies.

Because Harvey is liable to Goodridge under the Assumption Agreement and because Harvey's counterclaims and affirmative defenses against Goodridge are denied for reasons discussed below, we need not resolve Goodridge's claim against Harvey based on the Indemnity Agreement.

### III.

Harvey's counterclaims and affirmative defenses all stem from the same nucleus of factual contentions—that Goodridge knew of or participated in schemes to withdraw funds from Old CPI and to bribe Old CPI customers, that he sold his share of the company to Fernandez in order to facilitate a fraudulent sale of Old CPI to Harvey, and that Harvey was harmed by receiving a company with lower legitimate, sustainable sales and with higher tax liability than was revealed during its merger negotiations with Old CPI. Harvey alleges that the actions of Fernandez, Daula and Goodridge constitute common law fraud, violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1988), § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (1988), and violations of RICO. Harvey also asserts that the asserted misrepresentations breach the Merger Agreement or render the contract illegal and unenforceable.

### A. § 10(b)

Harvey alleges that Goodridge, Fernandez and Daula's conduct violates § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j. § 10(b) provides that it shall be unlawful for any person "To use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance...."

■ To establish liability under § 10(b) and Securities and Exchange Commission Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1990), proof of five elements is required: 1) damage to the defrauded party that was 2) caused by reliance on a misrepresentation or omission of material facts by the defrauding party, was 3) made with an intent to deceive, manipulate or defraud (scienter), was 4) in connection with the purchase or sale of securities, and was 5) furthered by defendants' use of the mails or any facility of a national securities exchange. *See, e.g., Perez–Rubio v. Wyckoff*, 718 F.Supp. 217, 232 (S.D.N.Y.1989).

Goodridge, Fernandez and Daula contend that Harvey has not shown that it sustained any injury caused by any misrepresentation or deceptive omission made in connection with Harvey's acquisition of Old CPI. Goodridge further argues that there is no evidence that he made any representations to Harvey or in any way was responsible for any representations or omissions made in connection with the merger, and that no evidence of scienter exists as to him.

*Connection to sale of security; use of mails*—There is no dispute that the disputed representations or omissions were made in connection with the sale of Old CPI to Harvey, or that the representations involved either the mails or a facility of a security exchange.

*Reliance on material misrepresentations or omissions*—During negotiations for Old CPI Harvey was presented with written materials and oral communications which contained materially false statements or misleading omissions, at a mini-

mum including Fernandez's assurances to Harvey Sampson that Old CPI was run in a legitimate manner and that rumors to the contrary were unjustified, and including Daula's and Fernandez's warranty in the June 26, 1981 Merger Agreement that Old CPI had been operated in compliance with all laws. These misrepresentations are material in the circumstances of this case because they were in response to specific concerns raised by Harvey as pertinent to its investment decision, and as an objective matter because they were likely to, and in fact did, conceal substantial legal expenses and potential liability to which a reasonable investor would attach importance in deciding whether or not to invest in Old CPI. *See Basic Inc. v. Levinson*, 485 U.S. 224, 240, 108 S.Ct. 978, 988, 99 L.Ed.2d 194 (1988).

Harvey also claims that the sales figures reflected in Old CPI's financial statements falsely indicated an inflated level of sustainable legitimate sales when in fact past sales levels were supported by the kickback scheme; Goodridge, Fernandez and Daula all respond that the reported sales figures in fact were accurate and that Harvey has made no showing that any bribes that did occur were necessary to secure sales, or that any subsequent decline in sales was due to the termination of the kickback scheme. Because Fernandez and, to a lesser extent, Daula made more direct misrepresentations which satisfy this element of Harvey's § 10(b) claim, evaluation of the sales figures from financial reports is reserved for the discussion below of causation and damages.

Harvey also contends that Old CPI's prospectuses and financial reports including the March 31, 1981 audit underreported Old CPI's tax liabilities by failing to state that certain claimed deductible business expenses were actually non-deductible illicit dividend distributions to Goodridge and Fernandez. The financial statements did reflect tax computations based on the false premise that all purported commission checks were normal salary expenses when in fact much of the amounts claimed were either used to bribe Old CPI customers or to line Fernandez's and Goodridge's pock-

ets. Whether that falsehood affected Old CPI's actual tax liability is disputed and is discussed below.

Even if one accepts all these communications as presenting materially false statements or misleading omissions, however, Harvey has introduced no evidence connecting those statements or omissions to Goodridge. As of January 1981 Goodridge had severed ties with Old CPI, and he never took part in substantive discussions or negotiations concerning the proposed merger. He had no direct contact with any Harvey official beyond the initial July 1980 meeting, about which no evidence was produced indicating that either Fernandez or Goodridge made particular representations other than general observations about the nature of the business and the strong performance Old CPI had attained in the most recent fiscal year. Finally, while Fernandez and Daula made numerous specific warranties to Harvey in connection with the merger, Goodridge made none.

Harvey alleges that even if Goodridge played no direct role in merger negotiations, he made misrepresentations within the meaning of § 10(b) because he caused false entries to be made in Old CPI's books and disguised those falsehoods in a way that future purchasers would be deceived by them, and because he conspired with Fernandez to sell Old CPI at an inflated price to Harvey and sold out his share of Old CPI solely in order to facilitate a fraudulent sale to Harvey.

 Harvey, however, has failed to provide any evidence of Goodridge's knowledge of or participation in a conspiracy to defraud Harvey. There is no evidence that Goodridge even had advance knowledge of or endorsed any representation to be made to Harvey. The evidence only shows that before his departure Goodridge arranged to have false entries made to Old CPI's books to disguise money that was being extracted for illicit purposes (either hidden income to Goodridge and Fernandez or funds to operate a bribery scheme), that Goodridge understood that a sale of Old CPI to Harvey was impossible while he

remained affiliated with Old CPI and that he was willing to sell his shares at an attractive price after acquiring that knowledge. Goodridge's purpose at most can be characterized as obtaining extra funds from Old CPI for his use while he was an officer of the company with knowledge of a possible sale of Old CPI which was to occur after his departure.

Indeed, Goodridge's attitude concerning Old CPI's methods of operation was that any irregularities in Old CPI's operations were prosaic and common to the industry and had little bearing on Old CPI's future performance. There is no evidence that it occurred to Goodridge that such activities were noteworthy or likely to cause future dispute in connection with a possible acquisition of Old CPI. The only concealment he undertook was to cause the entry in Old CPI's books of false commissions in odd amounts; this activity is evidence of Goodridge's desire to evade detection of his hidden income but it does not support the claim of a far-reaching attempt or conspiracy to deceive Harvey or any other potential buyer as to the strength of CPI's operations.

■ Accordingly, Harvey has failed to satisfy its burden of showing that Goodridge made a material misrepresentation or omission within the meaning of § 10(b). It has made a sufficient showing as to misrepresentations by Fernandez and Daula.

■ Under § 10(b), once a showing of a material omission has been made, the allegedly defrauded party's reliance is presumed. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *DuPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987). Moreover, Harvey's reliance on Fernandez's and Daula's misleading omissions and misrepresentations is confirmed by the credible testimony of Harvey C.E.O. Harvey Sampson that had he known of Old CPI's corrupt practices he would not have gone forward with the merger.

■ *Scienter*—The scienter element of § 10(b) and Rule 10b–5 is satisfied by a showing of "intentional or willful conduct designed to deceive or defraud investors," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 *reh'g denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976), or by reckless conduct where the allegedly defrauding party owes a fiduciary duty to the defrauded party. *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

Fernandez's misrepresentations without question were intentional and willful. He was specifically alerted to Harvey's concerns about possible bribery at Old CPI, and he was intimately involved in the bribe scheme that in fact existed. He nevertheless both orally and in the Merger Agreement's warranties represented that no such activity took place.

■ As is discussed above, there is no evidence that Goodridge played any role in misrepresentations to Harvey, let alone that he possessed an intent to deceive or even recklessness in connection with any representations or omissions that were made.

■ Harvey also has failed to show that Daula possessed the requisite scienter. Daula joined the company only in October 1980, long after the bribe scheme had been established. There was no evidence introduced as to his knowledge of or participation in any illicit payments. While Salter did report to him, there is no evidence Salter ever disclosed CPI's irregularities to Daula, and Goodridge's testimony indicates that the book-rigging system he, Fernandez and Salter devised created an appearance of complete propriety in CPI's operations. Daula sought to fire Mitchell Stein, who served no apparent purpose but who received sham commission checks, but this attempt was blocked by Fernandez. While Harvey makes a conclusory statement that these few factors triggered a duty for Daula to investigate and disclose the well-hidden scheme by which Fernandez and Goodridge had extracted funds from the corporation, in fact there is nothing in the record to indicate that Daula had sufficient

knowledge to be on notice of any improprieties at Old CPI. Accordingly, although his warranty that CPI's operations complied with all laws in fact was false, his misstatement has not been shown to have been intentional, willful or reckless.

*Existence of Damages to Harvey—* Goodridge, Fernandez and Daula all argue that Harvey has failed to show that it was harmed by any material misrepresentations or omissions that were made.

As noted above, Harvey has two theories of damages in this case. One is that nondisclosure of Old CPI's kickback scheme left Harvey with an inflated impression of the level of sales and profits that CPI could achieve when run in a lawful manner, and that the post-merger decline in earnings and revenue was solely attributable to Harvey's insistence that CPI end all unlawful activities and therefore should be recoverable. The other is that the sham commission payments used to generate funds for illicit purposes were wrongly claimed as legitimate business deductions on Old CPI's corporate tax returns, and that therefore when Harvey acquired Old CPI it acquired undisclosed tax liabilities resulting from past improper deductions.[4]

■ As to the asserted harm from New CPI's lower-than-expected sales after the merger, Harvey has failed to carry its burden of showing that any loss of sales that may have occurred was due to the cessation of Old CPI's irregular business practices. It is true that Old CPI engaged in an uncertain but substantial level of bribery as part of its sales efforts. However, Harvey has not succeeded in the admittedly difficult job of proving that Old CPI's sales derived from those bribes; while they may well have, it is also plausible that the only result of the bribe scheme was to secure additional kickbacks both for purchasing agents at Old CPI's various customers and for Old CPI's principals and, possibly, its sales agents. Moreover, even if the bribes did result in increased sales, Harvey has

not shown that the decline in sales volume about which it complains resulted from the termination of bribery rather than from other factors including the departure of key employees such as Goodridge and Vincent Avallone; an adverse business climate that affected the entire industry; and the suspension of Fairchild, the distribution of whose parts was a major source of CPI's income, from the Defense Department's list of approved suppliers.

■ As to the question of undisclosed tax liabilities, Harvey alleges that all sham commission checks were unlawfully deducted because they either generated funds for Goodridge and Fernandez and should have been treated as nondeductible constructive dividends or generated funds for bribes which could not lawfully be deducted. It is undisputed that no tax enforcement efforts have stemmed from the alleged tax liabilities, nor has Harvey incurred any actual liability arising from what it claims to have been wrongfully deducted commissions. Moreover, because Harvey has since sold Old CPI as well as other assets to another corporation, there is no apparent basis for any current liability on Harvey's part. Accordingly, Harvey cannot be said to have incurred any actual damages based on the asserted undisclosed tax liabilities. § 28(a) of the 1934 Act specifically provides that under that Act, which includes § 10(b), no person may recover "a total amount in excess of his actual damages on account of the act complained of." 15 U.S.C. § 78bb(a) (1988). Because Harvey has not shown any actual economic loss resulting from its assumption of the alleged undisclosed tax liabilities, it has failed to show damages within the meaning of § 10(b). *See Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460, 464 (9th Cir.1977), *Pelletier v. Stuart–James Co.*, 863 F.2d 1550, 1557 (11th Cir.1989).

■ Harvey claims that even if it has not been held accountable for the undisclosed liabilities, it nevertheless suffered

---

**4.** In its pre-trial memorandum, Harvey also claims that the value of Old CPI's inventory was overstated because CPI falsely claimed that Marlin had performed certain testing when in fact that was not the case. However, no evidence was introduced at trial to support this allegation or to quantify the supposed harm that occurred.

real economic loss because Old CPI's failure to disclose the asserted tax liabilities resulted in the overstatement of Old CPI's book value, which served as the basis for determining the purchase price of Harvey's acquisition of Old CPI. Based on the expert testimony of Steven Skalak, Harvey claims that the book value was overstated by $780,000 as of March 31, 1980, and that Harvey accordingly paid that amount more than it should have under the parties' mutually accepted basis for arriving at a purchase price for Old CPI.

This proposed measure of damages is too jerry-built to prevail. Even assuming that some deductions were wrongly taken and that CPI at the time of the merger had some theoretical unreported tax liability as a result, the remoteness of any possible enforcement of those liabilities, as confirmed by the subsequent lack of any enforcement action against New CPI, was so extreme that any substantial adjustment in the purchase price would have been unwarranted. At the least, even if CPI were theoretically liable to the extent Harvey claims, it cannot be said that Harvey has met its burden of proving by a preponderance of the evidence that Old CPI as a result was overvalued by the amount it claims, or by any amount.

Moreover, Goodridge has presented serious questions as to whether whatever portion of the claimed deductions were not used for commissions in fact were unlawful. Funds which were diverted to Goodridge and Fernandez for personal use could equally plausibly be characterized as ordinary income in Goodridge and Fernandez's capacity as employees, which would be a deductible ordinary business expense for Old CPI, as they could be deemed constructive dividends, which would not be deductible. Goodridge further argues, citing *Brizell v. Commissioner of Internal Revenue*, 93 T.C. 151 (1989) (kickbacks to customers' buying agents deductible as ordinary and necessary business expenses where payments' illegality not proven) and *Conway Import Co. v. United States*, 311 F.Supp. 5 (E.D.N.Y.1969), that funds used for bribes may also have been deductible as

expenses in the ordinary course of business. The argument is far from capricious although our decision does not depend on it.

▪ *Aider and Abettor Liability*— Harvey argues in the alternate that even if Goodridge's acts do not directly violate § 10(b) they establish his liability as an aider and abettor of fraudulent conduct by Fernandez. To establish its claim, Harvey must show 1) a violation of § 10(b) by the primary actor, 2) knowledge of this violation on the part of the aider and abettor, and 3) substantial assistance by the aider and abettor in the achievement of the primary violation. *IIT, An International Invest. Trust v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980).

▪ Because Harvey has not shown that it suffered any cognizable damages, it has not established the existence of an actionable primary violation of § 10(b) that Goodridge could have aided and abetted.

▪ Moreover, as discussed above, Harvey has not established Goodridge's knowledge, endorsement or complicity in any representation to be made to prospective purchasers of Old CPI, nor has it proven its contention that Goodridge's departure from Old CPI was part of a conspiracy between Fernandez and Goodridge to deceive Harvey into paying an inflated price for the company. While Goodridge was aware that his departure would facilitate a sale, Harvey has not shown that Goodridge knew of or contemplated what specific representations or material omissions would be made in furtherance of the sale. Harvey also has not shown that Goodridge substantially assisted the achievement of the asserted (but unproven) primary violation, because while Goodridge did facilitate the sale by leaving Old CPI he did not know of or assist Fernandez in the preparation of any representations or omissions to Harvey.

▪ Harvey argues that Goodridge's right to review the terms of any acquisition of Old CPI following his departure and to block mergers that did not adequately guarantee continued fulfillment of Old

CPI's obligations to him created in Goodridge a fiduciary duty to disclose Old CPI's past irregular practices to Harvey. However, Goodridge's involvement in Harvey's acquisition of Old CPI was limited to protecting his interests in existing obligations, and was not so substantial that he owed a duty to disclose to any potential purchaser.

### B. § 12(2)

■ Harvey also alleges that Goodridge, Fernandez and Daula's behavior violated § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (1988). § 12(2) makes liable to the purchaser "any person who offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading...."

The elements of § 12(2) are similar to those of § 10(b). Both provisions apply the same materiality standard. *See Ross v. Warner*, Fed.Sec.L.Rep. (CCH) ¶ 97,735 at 98,863 (S.D.N.Y.1980). § 12(2) lacks the stronger scienter requirement applied to claims under § 10(b), while § 12(2) applies only to persons who offer or sell securities.

Harvey contends that Goodridge is a seller within the meaning of § 12(2) because he conspired with Fernandez to facilitate a fraudulent sale to Harvey so that each of them could realize the greatest possible profit on their operation. *See Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir.1988) (defendant "at whose behest" false representations were made liable under § 12(2)). As is discussed above, however, Goodridge's ties with Old CPI were severed before the merger, and he played no role in Old CPI during merger negotiations, nor did he ever make any representations to Harvey. Moreover, Goodridge's compensation pursuant to the sale of his share of Old CPI was guaranteed regardless of when or whether any future sale of the company occurred, which as a factual matter discredits Harvey's contention that Goodridge was integrally but clandestinely involved in CPI's merger with Harvey. Even if, as

Harvey emphasizes, Goodridge's departure was to facilitate an eventual sale and his compensation was fashioned to equal roughly half the proceeds of an eventual sale, Goodridge's actions are consistent with those of any self-interested shareholder cashing in his or her shares. Accordingly, he is not a "seller" as to Harvey within the meaning of § 12(2).

■ Fernandez and Daula clearly are statutory sellers. Fernandez represented Old CPI throughout the extensive negotiations between the parties, and both he and Daula signed the Merger Agreement. Nevertheless, as is the case with its § 10(b) claim, Harvey has failed to show that it suffered cognizable damages as a result of the material misrepresentations and omissions made. Accordingly Harvey's § 12(2) claim cannot prevail.

### C. Common Law Fraud

Harvey also claims that Fernandez, Daula and Goodridge committed common law fraud.

■ Under New York law, to establish its claim Harvey must demonstrate 1) misrepresentation or nondisclosure of a material fact, 2) intent to deceive by the defrauding party, 3) justifiable reliance upon the misrepresentation by the defrauded party, and 4) injury to the defrauded party as a result of its reliance. *Idrees v. American University of Caribbean*, 546 F.Supp. 1342, 1346 (S.D.N.Y.1982); *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214, 216–17 (1969). Because these elements are substantially identical to those governing § 10(b), the identical analysis applies here, and Harvey has failed to make a sufficient showing as to Goodridge, Daula or Fernandez, or as to Goodridge's liability as an "aider and abettor".

### D. RICO

■ Harvey claims that Fernandez, Goodridge and Daula also are liable to it under RICO, 18 U.S.C. § 1962(c). To establish its claim, Harvey must show that the defendant 1) conducted the affairs 2) of an enterprise 3) through a pattern 4) of

racketeering activity 5) that has caused injury to the complaining party's business or property. *Kuczynski v. Ragen Corp.*, 732 F.Supp. 378, 385 (S.D.N.Y.1989); *see also Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). While there is little doubt that all three defendants on Harvey's counterclaims conducted the affairs of an enterprise, namely CPI, the other elements are in substantial dispute. Because, as is discussed above, Harvey has failed to show that it suffered any actual injury as a result of the alleged fraudulent scheme, either in the form of lost sales or profits or undisclosed liabilities, Harvey is precluded from recovering pursuant to RICO just as it is pursuant to other theories it advances. For that reason, this opinion need not address whether any of the parties engaged in acts that might be deemed a pattern of racketeering activity.

## IV.

 While Harvey has failed to prevail on its counterclaims, there remains the question whether it has made a sufficient showing to excuse performance of its obligations to Goodridge pursuant to the Assumption Agreement.

Harvey alleges that the merger was fraudulently induced by misrepresentations which it attributes to Fernandez, Daula and Goodridge, and argues that it therefore should not be required to make payments to Goodridge for which it became liable as a result of the merger. As discussed above, while Goodridge was not responsible for any material misrepresentations or omissions that were made, Fernandez and Daula did falsely warrant that Old CPI had been operated in a lawful manner, a representation that clearly was material to Harvey's decision to merge with the company.

It is arguable that Harvey might prevail if it now sought to invalidate the entire merger based on Fernandez's and Daula's misrepresentations. However, Harvey seeks only to disassociate itself from its obligations to Goodridge which arise from and are inextricably interrelated with all aspects of the Merger Agreement, without forfeiting the remainder of that agreement, notably its acquisition of CPI, which it in turn sold at an unidentifiable but possibly substantial price in 1982.

Goodridge rightly observes that the June 26, 1981 Merger Agreement and the August 5, 1981 closing documents refer to and incorporate each other, and all facilitate the same transaction. Accordingly, all elements of those agreements, specifically including the Assumption and Indemnity Agreements, must be interpreted together and function as if they were one instrument. *See BWA Corp. v. Alltrans Express U.S.A., Inc.*, 112 A.D.2d 850, 493 N.Y.S.2d 1, 3 (1st Dep't 1985). According to a variety of old but still valid authority which Goodridge invokes, one who seeks to escape performance of a fraudulently induced contract can only do so by rescinding the entire agreement, and cannot escape performance of its obligations while retaining the benefits it realized from the agreement. *See Wood v. Dudley*, 188 A.D. 136, 176 N.Y.S. 494, 497–97 (1st Dep't 1919); *see also National Wall Paper Co. v. Hobbs*, 35 N.Y.S. 932, 933 (1st Dep't 1895). Accordingly, Harvey's remedy must either be to attempt to recover whatever damages may be due it from Fernandez and Daula (as it in fact did here), or to attempt to extricate itself from the entire contract.[5] Harvey cannot simply disavow those portions of the contract which it finds most odious.

## V.

To summarize, Goodridge's contract claim is granted. Harvey's counterclaims and affirmative defenses are denied.

Submit judgment on notice.

---

**5.** Harvey has waived its rights to rescission by its protracted inaction; it is well established that rescission must be promptly sought after the aggrieved party learns of the alleged fraud, or else is waived. *See United States ex rel. Roman v. Schlesinger*, 404 F.Supp. 77, 86–87 (E.D.N.Y.1975); *Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp.*, 184 F.Supp. 116, 118 (S.D.N.Y.1959), *aff'd*, 274 F.2d 805 (2d Cir.1960), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727. Harvey learned of the apparent irregularities at Old CPI by March or certainly August 1982; however, rather than attempt an immediate rescission of the fraudulently induced merger it sold assets including CPI for $26 million and merely stopped payments to Goodridge.

## SUPPLEMENTAL DECISION

This decision supplements the Findings of Fact and Conclusions of Law filed on June 28, 1991. That decision did not reach the issue of The Harvey Group, Inc.'s ("HGI") liability to Arnold Goodridge and New Wave Electronics, Inc. (collectively "Goodridge") and to Frank Fernandez under its agreement to indemnify Fernandez for obligations arising from Fernandez's guarantees to Goodridge, nor whether and to what extent Goodridge and Fernandez are entitled to receive legal fees and costs from HGI or New CPI.

The rulings made in the June 28 opinion as to Components Plus, Inc.'s ("New CPI") liability to Goodridge under the Assumption Agreement, and as to counterclaims brought by HGI and New CPI, remain undisturbed.

### I.

The Assumption Agreement[1] by which the acquiring company assumed all Old CPI's obligations to Goodridge was signed only by representatives of Old CPI and of Neboc (now known as "New CPI"), but not by Neboc's parent company HGI. Because it previously has been held that there is no basis to "pierce the corporate veil" and hold HGI liable under that agreement, the sole means by which liability can attach to HGI, as opposed to its subsidiary, is through the Merger Agreement and related indemnity letter (collectively "Indemnity Agreements") which also were executed at the time of the acquisition of Old CPI.

Unlike the Assumption Agreement, the Merger Agreement[2] and Indemnity Letter[3] pursuant to that Agreement obligate HGI directly to Fernandez.

Section 6.7 of the Merger Agreement provides:

Harvey shall use its best efforts to cause Fernandez to be released from each of the guaranties by him of CPI obligations ("Guaranties") listed in Schedule XIX hereto and, on or prior to the Closing Date, will execute and deliver to Fernandez a letter, dated the Closing Date ("Indemnity Letter"), substantially in the form of Exhibit E hereto, pursuant to which Harvey will agree to indemnify Fernandez against all claims, losses, liabilities and expenses, including reasonable attorneys' fees, which may be incurred by him under the Guarantees.

In its August 3, 1981 Indemnity Letter to Fernandez pursuant to this provision, HGI stated in pertinent part:

Pursuant to Section 6.7 of the Agreement and Plan of Merger ... the undersigned (HGI) agrees to indemnify you and hold you harmless from any claims, losses, liabilities and expenses, including reasonable attorneys' fees, arising out of, based upon or relating to your guaranties ("Guaranties") of the obligations of CPI as listed on Schedule XIX to the Agreement.

The guarantees listed in Schedule XIX included Fernandez's "Guarantee of the obligations of CPI, dated January 21, 1981, in favor of Goodridge and New Wave." Pl. Ex. 26–29. That guarantee,[4] executed at the time of Old CPI's buyout of Goodridge's shares in the company, obligated Fernandez to provide a personal guarantee of "prompt and unconditional payment" of Old CPI's obligations to Goodridge. The guarantee agreement further provides that "The Guarantor waives any right of subrogation, reimbursement or indemnity whatsoever and any right of recourse to security for the Obligations unless and until all Obligations have been paid and performed in full." Fernandez previously has been held liable to Goodridge under this Guarantee. *See Goodridge v. Harvey Group, Inc.*, 728 F.Supp. 275 (S.D.N.Y.1990).

Fernandez seeks indemnification, legal fees and costs from HGI pursuant to the Indemnity Agreements, while Goodridge alleges that he is entitled to collect directly from HGI as an intended third party beneficiary of those agreements. HGI re-

1. Pl.Ex. 26–41.

2. Pl.Ex. 26–1.

3. Pl.Ex. 26–39.

4. Pl.Ex. 20.

sponds (1) that neither Fernandez nor Goodridge is entitled to collect because in the Guarantee Agreement Fernandez waived any right to indemnification prior to his satisfaction of all obligations to Goodridge and because Fernandez has not paid Goodridge under the Guarantee, (2) that regardless of Fernandez's asserted waiver, HGI's liability on the agreement has not matured as a matter of law because Fernandez has failed to satisfy the liability he has incurred, (3) that Fernandez's alleged fraudulent inducement bars recovery under the Indemnity Agreements, and (4) that Goodridge is at most an incidental and not an intended third party beneficiary of the agreements who therefore is not entitled to recover directly from HGI.

*1) Fernandez's alleged waiver of indemnification rights*—HGI correctly observes that even if Goodridge were an intended third party beneficiary of the Indemnity Agreement, he nevertheless would enjoy no greater rights than those of Fernandez under that agreement. HGI argues that in the Guarantee Agreement Fernandez waived any right to seek indemnification from any source before he personally satisfied his obligations to Goodridge, and that that limitation is incorporated by reference into the Indemnity Agreements between HGI and Fernandez so that neither Goodridge nor Fernandez has any right to "indemnification" from HGI before Fernandez satisfies his obligations to Goodridge.

Goodridge strenuously objects to the court's consideration of this argument as prejudicial to him and as waived by HGI because it was not raised until after several days of trial. While his procedural objections may have merit, we will reach the question HGI has raised because it goes to the case's central dispute as to the parties' contractual obligations and because, in any event, the substantive outcome favors Goodridge.

It is true that in the January Guarantee Agreement Fernandez waived "any right of subrogation, reimbursement or indemnity whatsoever and any right of recourse to security for the Obligations unless and until all Obligations have been paid and per-

formed in full." However, the Guarantee Agreement was solely between Goodridge, his consulting firm and Fernandez, and was executed at the time of Old CPI's buyout of Goodridge's share of the company. The agreement and the particular passage in question must be considered in that context and interpreted as of the date of execution. *See Benvenuto v. Rodriguez*, 279 A.D. 162, 108 N.Y.S.2d 410, 412 (1st Dept.1951), *app. den.*, 279 A.D. 777, 109 N.Y.S.2d 360 (1952); *X.L.O. Concrete Corp. v. John T. Brady & Co.*, 104 A.D.2d 181, 482 N.Y.S.2d 476, 479 (1st Dept.1984), *aff'd*, 66 N.Y.2d 970, 498 N.Y.S.2d 799, 489 N.E.2d 768 (1985).

■ The passage in question when considered in the context of the agreement of which it is a part cannot be understood to have waived Fernandez's rights at large or, in particular, his rights deriving from subsequent agreements with HGI which were not even being negotiated at the time and which arose in the different context of HGI's and Neboc's acquisition of Old CPI. At the time of the Guarantee Agreement with Goodridge, Fernandez possessed no potential rights of "subrogation, reimbursement or indemnity" from any source except Old CPI or Goodridge himself. Accordingly, the most logical reading of the sentence to which HGI attaches such importance is simply that Fernandez agreed to pay Goodridge in full before seeking any offsetting payments *from either Old CPI or Goodridge.* Such an agreement was simply intended to assure Goodridge prompt payment. It does not extinguish rights of Fernandez or, by extension, of Goodridge with respect to entities not involved in the January 1981 transactions, and with which Fernandez contracted subsequently.

This conclusion is reinforced by the language of the sentence which precedes it in the Guarantee Agreement, and which provides, "Guarantor hereby agrees that this guarantee may be enforced without requiring Goodridge or Consultant first to resort to any other right, remedy or security." The clear purpose of this sentence, which sheds light on the meaning of other sections of the same paragraph, is to solidify

Goodridge's right to immediate and direct recourse against Fernandez in the event of a breach by Old CPI without any procedural delays or evidentiary obstacles. The contract's facilitation of Goodridge's ability to recover quickly on Old CPI's obligations is not inconsistent with Fernandez's later contract with HGI to ensure that he in turn would not be exposed to any claims, losses, liabilities or expenses arising from his guarantee to Goodridge.

*2) Alleged prematurity of indemnification claim*—HGI maintains that "The plain language of the Guarantee forbids, *inter alia,* the assertion of a claim by Fernandez for indemnification against HGI unless and until Fernandez pays the underlying obligations to plaintiffs in full." *HGI's Memorandum in Support of Motion to Dismiss,* April 2, 1991, at 3. Accordingly, it contends, Goodridge cannot recover from HGI until Fernandez has discharged all his obligations to Goodridge.

▇▇▇▇ Goodridge correctly responds that HGI's argument is at odds with the agreements' actual language. By their explicit terms the Indemnity Agreements indemnify Fernandez against "any claims, losses, liabilities and expenses ..." based upon or relating to his obligations under the Guarantee Agreement, rather than merely against any actual losses or expenses. It is established under New York law that agreements to indemnify against liability become enforceable when the liability is fixed, rather than solely upon the indemnified party's satisfaction of that liability. *See De Angelis v. Smith,* 95 N.Y.S.2d 52, 54 (Sup.1949); *Martinez v. Fiore,* 90 A.D.2d 483, 454 N.Y.S.2d 475 (2d Dept.1982) ("a party seeking indemnity must be held liable to the plaintiff before he can recover over from a third party"). Because judgment has been entered against Fernandez on the Guarantee, he plainly has incurred both a claim and a liability based upon and relating to that

agreement. Accordingly, under the express terms of the agreement Fernandez is entitled to indemnification now, whether or not he has already made good on his obligations to Goodridge,[5] as is any intended third party beneficiary of the Indemnity Agreements.

*3) Alleged fraudulent inducement of Indemnity Agreements*—HGI argues that because Fernandez made material misrepresentations and omissions during negotiations leading to Neboc's acquisition of Old CPI he and, by extension, Goodridge are barred from recovery under the Indemnity Agreements as well as other agreements which resulted from those negotiations. *See National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 203–04 (2d Cir.1989) ("[U]nder New York law, a party may not compel performance of an agreement which that party has induced by fraud"; fraudulent inducement of one contract might in some cases excuse performance of another contract arising from same exchange).

▇▇ However, as was established in the June 28 opinion, even if Fernandez's misrepresentations might have justified rescission of the entire merger agreement and related contracts, HGI cannot now prevail on an affirmative defense of fraudulent inducement because it failed to rescind the entire transaction in a timely manner. For the reasons cited in that opinion, and because the Indemnity Agreements were an inextricable part of the cluster of agreements which facilitated the acquisition of Old CPI, HGI is not entitled to take the benefits of that transaction and yet disavow the obligations which it assumed simultaneously. In addition, although a finding of misrepresentations by Goodridge as opposed to Fernandez might not be necessary to support HGI's defense of fraudulent inducement to the Indemnity Agreements, it is worth noting that Goodridge

---

**5.** HGI also maintains that Goodridge's attempt to collect on the Indemnity Agreements before Fernandez has satisfied the judgment against him is an effort to alter materially HGI's obligations which as a matter of law extinguishes those obligations. Because in fact HGI's liability under the Indemnity Agreements was triggered at least by the entry of judgment against Fernandez, Goodridge's claim is permissible under the Indemnity Agreements, and no such alteration of HGI's obligations occurred.

has not been shown to have made any actionable misrepresentations to HGI.

█ *4) Goodridge's Status as Intended Beneficiary*—HGI contends that Goodridge is not an intended third party beneficiary of the Indemnity Agreements who would be entitled to collect directly from HGI. It argues that he is a merely incidental beneficiary not entitled to direct recovery from HGI.

The Indemnity Agreements do not specifically recite an intent or purpose of guaranteeing ultimate payment to Goodridge, but do make specific reference to three guarantees which Fernandez had executed, one of which was his guarantee of Old CPI's obligations to Goodridge. The Agreements indemnify Fernandez against all liabilities to Goodridge as well as any costs, specifically including reasonable legal fees, associated with his Guarantee. Additionally, Section 6.7 of the Merger Agreement also provides that "Harvey shall use its best efforts to cause Fernandez to be released from each of the guaranties...."

Beyond the terms of the Agreements, Goodridge points to several indications of the parties' intent to benefit him. Among these is the deposition testimony read at trial of Harvey Sampson, Chairman of HGI, who stated that he recalled "that we had to guarantee Frank Fernandez' commitment to Arnold Goodridge," and that the indemnity (which in depositions was intermittently referred to by all participants as a "guarantee") was included because "I can only assume that Arnold Goodridge wanted this guarantee." Sampson Dep.Tr. 357. When asked to confirm that he agreed to provide such a guarantee or indemnity, Sampson replied, "Yes, or The Harvey Group did. Correction, Frank Fernandez wanted it." *Id.* Sampson further agreed that Goodridge "of course" also was interested in the "guarantee." *Id.*

Goodridge also points to Sampson's endorsement of the statement by HGI's counsel during depositions that the structure of the agreements surrounding HGI's acquisition of Old CPI indicates "that when entering this transaction Harvey had every intention of paying Mr. Goodridge out fully for everything that was due and owing to him." Sampson Dep.Tr. 360.

Fernandez testified that he insisted on indemnification during his negotiations with HGI, stating that his position was "if there's no indemnity there's no deal." On cross examination, he replied "yes" when asked whether it was his understanding at the time that the indemnity relieved him of liability to Goodridge.

HGI has attempted to rebut this evidence by observing that on cross examination Goodridge acknowledged that at the time of the August 1981 agreements between HGI and Old CPI and Fernandez, he was unaware of the Indemnity Agreements which Fernandez had secured from HGI. However, Goodridge's intent is irrelevant to the question whether the parties to the Indemnity Agreements intended to benefit him.

The evidence establishes that Goodridge was an intended beneficiary of the Indemnity Agreements under New York law.

New York has adopted the Restatement (Second) of Contracts approach to distinguishing between intended third-party beneficiaries and incidental beneficiaries. *See Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,* 66 N.Y.2d 38, 44–45, 495 N.Y.S.2d 1, 485 N.E.2d 208 (1985); *see also Septembertide Publishing, B.V. v. Stein and Day, Inc.,* 884 F.2d 675, 679 (2d Cir. 1989). Section 302 of the Restatement provides:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Under New York law "the obligation to perform to the third party beneficiary need not be expressly stated in the contract," *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 573 (2d Cir.1991). To determine whether Goodridge is an intended beneficiary of the Indemnity Agreement, we consider both "the intent of the parties—as revealed in their agreement—and the surrounding circumstances." *Septembertide,* 884 F.2d at 679; *see also Owens v. Haas,* 601 F.2d 1242, 1250 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

Goodridge plainly meets the requirements of both parts (a) and (b) of Section 302(1). If he obtains direct performance from HGI, Fernandez's liability will be discharged. Moreover, Fernandez's testimony in support of Goodridge's efforts to collect on the Indemnity Agreements, although self-serving, indicates his intention to give Goodridge the benefit of the promised performance, as does Fernandez's apparent inability to satisfy the judgment against him in Goodridge's favor absent recovery on the Indemnity Agreements. The main question therefore becomes whether "recognition of a right to performance in the beneficiary is appropriate to effectuate the intent of the parties."

Here the available indications of the parties' purpose demonstrate the requisite intent to benefit Goodridge. Sampson's deposition testimony, read into the record at trial, expressed his understanding during negotiations with Fernandez that the Indemnity Agreements were desired by Goodridge and likely would bolster Goodridge's ability to recover on the guarantee he had secured from Fernandez. His use of the term "guarantee" for the Indemnity Agreements, his belief that Goodridge "of course" was also interested in the Indemnity Agreements, and his stated understanding that the reason for the indemnity was that "we had to guarantee Frank Fernandez' commitment to Arnold Goodridge" indicate a belief that Goodridge would derive the ultimate benefit whether payment was made directly to Goodridge or to Fernandez.

Fernandez's testimony that he understood the indemnity agreement to relieve him of liability to Goodridge, although self-serving, also indicates his understanding that Goodridge would derive the benefit of the agreement in the sense that any money required to compensate Goodridge would come, directly or at least indirectly, from HGI.

In sum, both Sampson's and Fernandez's testimony as well as the "best efforts" provision conclusively demonstrate an intent that Goodridge was to be the ultimate beneficiary of HGI's indemnification of Fernandez.

This conclusion is consistent with and reinforced by that reached by the Court of Appeals for this Circuit in *Septembertide Publishing, supra,* which held under New York law that an author was an intended third party beneficiary of an agreement by its publisher to sublicense paperback publishing rights of the author's work, despite the lack of any express contractual provision for or expectation among the parties of direct payment to the author. As in the present case, in *Septembertide* the contract upon which the beneficiary sought to recover provided for payments to be made to a party which subsequently became insolvent and which in turn was obligated to make payments in a related matter to an alleged third party beneficiary. 884 F.2d at 677.

Here the contract between Goodridge and Fernandez did not specifically provide for Goodridge to recover the actual money Fernandez received under any subsequent indemnity agreement, while the analogous contract in *Septembertide* provided for the beneficiary to recover a share of proceeds from the contract between the hardcover publisher and the paperback sublicensor. 884 F.2d at 679. Nevertheless, in both the instant case and *Septembertide* the evidence establishes that at the time of the agreement between promisor and promisee the promisee intended for the beneficiary to receive money received from the promisor.

HGI's intent is indicated in the same manner as was the promisor's in *Septembertide* by the fact that the contract between HGI and Fernandez made specific reference to Fernandez's obligations to Goodridge under the Guarantee Agreement. 884 F.2d at 680. Both the language of the contract and Sampson's testimony indicate HGI's awareness of Fernandez's interest in securing a source of funds to cover his obligations to Goodridge and his likely intent to use funds received from HGI for that purpose.

Accordingly, Goodridge is an intended beneficiary of the Indemnity Agreements and is entitled him to collect directly from HGI on them.

## II.

There remains the issue of Fernandez's and Goodridge's legal fees, costs and interest on those expenses.

In the Guarantee Agreement Fernandez guarantees to Goodridge payment of "all fees and expenses which Goodridge or Consultant may pay or incur in enforcing or collecting" CPI's obligations to him. Pl. Ex. 20 at 2. Accordingly, Fernandez is liable to Goodridge in the amount of such fees.

The Indemnity Agreement specifically provides for HGI's payment of all Fernandez's costs associated with his Guarantee to Goodridge, including reasonable legal fees. As has been stated above, HGI's affirmative defenses against Fernandez cannot prevail because it failed to rescind the entire agreement of which the Indemnity Agreement is an integral part. Accordingly, Fernandez is entitled to recover from HGI all reasonable legal fees relating to those Guarantees.

Moreover, because Fernandez has now been held liable for Goodridge's legal fees pursuant to the Guarantee, and because Goodridge by this opinion has been held to be entitled to collect directly from HGI as an intended beneficiary of its indemnification of Fernandez's liabilities pursuant to the Guarantee, HGI also is liable to Goodridge in the amount of his reasonable attorneys' fees.

Finally, the Pretrial Order indicates that the parties seek an adjudication of the liability of New CPI to Goodridge on the promissory note, employment and consulting agreements. The employment and consulting agreements do not contain attorney fee provisions, though the Note does. Pl. Ex. 17 at 4. Accordingly, CPI is liable to Goodridge in the amount of reasonable fees arising from his enforcement of the Note.

## Conclusion

HGI is liable to Fernandez on the Indemnity Agreements and through him to Goodridge in the amount of Fernandez's liabilities to him pursuant to the Guarantee Agreement from HGI because Goodridge is an intended beneficiary of the Indemnity Agreements between HGI and Fernandez. Fernandez is liable to Goodridge for his attorneys' fees and costs under the Guarantee. Goodridge is entitled to recover attorneys' fees and costs from HGI as an intended beneficiary of the Indemnity Agreements because the Indemnity obligates HGI to Fernandez for all expenses pursuant to the Guarantee, and because those expenses include Fernandez's liability to Goodridge for his legal fees and costs. CPI also is liable for Goodridge's fees and costs in enforcing the Note.

Submit judgment on notice as to amount of damages. Application for attorneys' fees should be made in accordance with the procedures of this Court.

It is so ordered.